UNITED STATES DISTRICT COURT        b
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

SHAWN SHELTON                 CIVIL ACTION NO. 1:14-CV-03293

VERSUS                           CHIEF JUDGE DRELL

JERRY GOODWIN                MAGISTRATE JUDGE PEREZ-MONTES

## REPORT AND RECOMMENDATION

I.    Background

Before the Court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by petitioner Shawn Shelton ("Shelton"). Shelton challenges the validity of his 2010 conviction and sentence, imposed in the Louisiana Tenth Judicial District Court in Natchitoches Parish, on one count of manslaughter. Shelton was sentenced to thirty years imprisonment. See State v. Shelton, 2011-22 (La. App. 3d Cir. 9/28/11), 75 So.3d 512, writ den., 2011-K-2405 (La. 3/9/12), 84 So.3d 552.

Shelton raises the following grounds for habeas relief:

1. Shelton claims he had ineffective assistance of trial counsel because: (1) the State was only able to prove that James had drugs in his system and that those drugs caused his death; (2) he failed to object to the erroneous jury instructions on manslaughter; (3) he failed to investigate James's drug abuse and interview James's ex-girlfriend and her family; (4) he failed to call an expert witness to testify about how the drugs were introduced into James's system; and (5) he failed to investigate and interview Roy Harris, the roommate who initiated the call to 911.

2. Shelton's appellate counsel was ineffective for failing to raise multiple issues on appeal: (1) improper admission of other crimes evidence, and (2) the trial court erred by denying the motion to continue the sentencing hearing and imposing an excessive sentence.

Shelton claims, and Respondent concedes, that Shelton exhausted his state court remedies.

## II. State Court Factual Findings

The facts of this case as set forth by the Louisiana Third Circuit Court of Appeal at Shelton, 75 So.3d at 513-16, are as follows:

> On October 29, 2005, the victim, James, and his friend, Justin Wise (Wise), were drinking beer and watching television at the home of the victim's sister's boyfriend, about a 45–minute drive from Natchitoches. Two other friends, Josh Collins (Collins) and Brent McDaniel (McDaniel), called and asked James and Wise to come to their apartment in Natchitoches. The victim and Wise left for Natchitoches around 9:30 or 10:00 p.m.
>
> The young men visited on the balcony of the third-floor apartment for two or three hours and saw Shelton at the apartment complex. According to Wise, Shelton said he had flown in from Hollywood, and someone had stolen his black Hummer vehicle. Collins, however, testified that Shelton told them he was waiting for a friend to return with the Hummer. McDaniel recalled people at the apartment complex gathered around a black Hummer. This was the same vehicle owned by Shelton in which Nevada police found cameras, and photos of young males, nude from the waist down. Some of the photos were taken inside Shelton's Hummer.
>
> When it "got kind of late," Wise went inside and went to sleep on the couch, while James remained on the balcony of the third-floor apartment. At some point, James woke Wise and told him that Shelton had invited him to come down to his apartment; he asked if Wise wanted to go. Wise declined, and at 3:35 a.m. on October 30, 2005, the victim called Collins's cell phone from a number Shelton identified in a written statement as his. Collins told the victim to come up to his apartment, and he then went to sleep. James never returned to Collins' apartment.
>
> During the early morning hours, James sent several messages to the telephone of his sister, Destiny James (Destiny), from an AOL account. Although Destiny believed the messages were received around 4:00 a.m.

2

to around 6:00 a.m., a printout of the messages introduced into evidence showed they were sent from 2:01 a.m. to 4:26 a.m. The messages indicated James had met "a pretty cool dude" named Shawn Shelton who was a producer for a movie company. The messages were sent from Shelton's computer.

Contrary to his representations to James, Shelton was no movie producer. Kirk Kepper (Kepper), a movie producer, actor, and principal in Skinny Giraffe Productions, filming a movie in Natchitoches at the time of the victims' [sic] death, testified. According to Kepper, Shelton was originally hired for security work associated with the movie, and then worked as a runner and production assistant. Kepper told him he would have the "vanity title" of assistant producer when the movie was released. He further testified that Shelton had not been employed with Kepper for approximately three weeks to a month prior to his meeting James on October 29, 2005.

The record reveals Shelton was anything but a "cool dude" or movie producer. Shelton was a former California police officer convicted of sexually assaulting a fourteen-year-old boy in Nevada while the current charge was pending. He was later convicted and is serving a thirty-five year to life sentence in prison. Shelton used subterfuge to lure the young boy in Nevada to accompany him. In that episode, Shelton posed as a law enforcement officer investigating a crime. Shelton used a Polaroid camera to take pictures of the Nevada boy as part of his scheme to sexually assault him. Other photos of young men nude from the waist down were found in Shelton's possession in his black Hummer. These young men appear to be in drug induced states while being sexually assaulted.

Kepper was driving Shelton's black Hummer to Natchitoches on October 30, 2005 after staying overnight in Lafayette with the Hummer when he received a call from one of Shelton's roommates, saying something was wrong at the apartment. Apparently the roommate was unable to make a 911 call and "was kind of freaked out." Kepper was then successful in calling 911.

Randy Williams of the Natchitoches Police Department was dispatched to the Frog Pond Apartments in response to the 911 call. Upon arrival at Shelton's apartment, he saw the victim, nude from the waist down, wearing only two t-shirts, lying on the floor with his legs inside a

bedroom and the rest of his body extending into the living room. Shelton appeared to be performing CPR on him. Williams noticed a brownish substance in front of the closet in the bedroom with a blanket on top of part of it, and he saw drag marks on the floor leading from Shelton's bed to where the body was lying in the doorway. He testified it appeared to him that someone made an effort to clean the scene and hide the substance on the floor.

James arrived dead at the hospital. He died as the result of ingesting lethal quantities of morphine and cocaine allegedly distributed or dispensed to him by Shelton. Williams testified that he observed the victim's body at the hospital while it was being examined by the assistant coroner. He observed that there was a shiny substance on the victim's rectum and that his rectum appeared "opened". He further testified that the victim's "rear end" was "very clean," which he found very odd, considering that in his experience when a person dies their bowels empty and, as he stated, "that's not the part you want to look at." In his experience, the area was too clean under the circumstances.

Detective Corporal Jayson Linebaugh of the Natchitoches Police Department also responded to the call. He took a statement from Shelton in which he claimed he woke up and saw the victim on the floor. He claimed the victim did not respond when he tried to wake him, and that the victim vomited when he tried to rouse him. Testimony at trial established that a brown substance, which appeared to be the victim's vomit, was observed on the pillow case, comforter, and afghan in Shelton's room. Shelton further stated that earlier in the evening, the victim asked if Shelton had a computer to email his sister. Shelton claimed he went to bed, but the victim kept coming in throughout the night, using the computer while he slept. According to Shelton, when he found James, he was not breathing, and he tried to revive him with CPR.

Linebaugh testified that it looked like someone had unsuccessfully tried to clean the brown stain on the carpet in the bedroom and that he too observed smear marks "like it had been ground down into the carpet."

Testimony by James' sister and friends established that James was not a drug user and had not used drugs in their presence on the day he died. They also testified that James was not a homosexual and to their knowledge did not engage in homosexual activity. To their knowledge James was only interested sexually in females.

III. Law and Analysis

    A. Ineffective Assistance of Trial Counsel Claims

Shelton contends he had ineffective assistance of counsel because the State was only able to prove that James had drugs in his system and that those drugs caused his death. Shelton contends his trial attorney should have: (1) objected to the hearsay testimony by Mr. Parker (a lay witness) as to Dr. Peretti's autopsy of James; (2) objected to the erroneous jury instructions regarding manslaughter; (3) investigated James's drug abuse and interviewed James's ex-girlfriend and her family; (4) called an expert witness to testify about how the drugs were introduced into James's system; and (5) investigated and interviewed Roy Harris, the roommate who initiated the call to 911.

To prevail on a habeas complaint of ineffective assistance of counsel, a complainant must meet the two-pronged test set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984): (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. See Jones v. Cain, 227 F.3d 228, 230 (5th Cir. 2000). A defendant is prejudiced if there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different. To make that determination, the court must examine the proceedings as a whole, giving due consideration to the weight of the evidence

5

supporting the verdict and evaluating the alleged failings of counsel in that total setting.  See Jones, 227 F.3d at 230.

The court does not assess any alleged error in isolation.  In an examination of state proceedings under 28 U.S.C. § 2254, the court will not reject an adjudication on the merits unless the action by the state court is found to be contrary to, or an unreasonable application of, clearly established federal law, or the state court's determination of the facts is manifestly unreasonable in light of the evidence.  See Jones, 227 F.3d at 230.

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time.  See Dowthitt v. Johnson, 230 F.3d 733 (5th Cir. 2000), cert. den., 532 U.S. 915 (2001) (citing Strickland, 466 U.S. at 689).  Thus, the court's scrutiny of counsel's performance is highly deferential.  The court must be particularly wary of arguments that essentially come down to a matter of degrees, such as whether counsel investigated enough or presented enough mitigating evidence.  Those questions are even less susceptible to judicial second-guessing.  See Dowthitt (citing Kitchens v. Johnson, 190 F.3d 698, 703 (5th Cir. 1999)).

In a habeas proceeding alleging ineffective assistance of counsel, the petitioner has the burden of proof.  See U.S. v. Chavez, 193 F.3d 375, 378 (5th Cir. 1999) (citing Clark v. Collins, 19 F.3d 959, 964 (5th Cir. 1994), cert. den., 513 U.S. 966 (1994)).

        1.      <u>Hearsay testimony by Parker was harmless error.</u>

First, Shelton contends his attorney was ineffective for failing to object to the hearsay testimony by Mr. Parker, a lay witness, as to Dr. Peretti's autopsy of James.

A coroner is required to make a written report of his investigation to the district attorney in any case involving a homicide pursuant to La. C.Cr.P. art. 105. A coroner's report and a procès verbal of an autopsy shall be competent evidence of death and the cause thereof, but not of any other fact. La. R.S. C.Cr.P. art. 105.

Both the federal and state constitutions provide that an accused is entitled to confront the witnesses against him. <u>See</u> U.S. Const. amend. VI; La. Const. of 1974, art. I, § 16; <u>see also</u>, La.Const. of 1921, art. I, § 9. This guarantee has been enhanced in our State's present constitution by its specific statement that an accused is also entitled to cross-examine the witnesses against him. <u>See</u> La.Const. of 1974, art. I, § 16. Although the right of confrontation is not absolute, it is generally accepted that any qualification of the right must be justified by necessity and attended by strong assurance that evidence admitted thereunder will be reliable. <u>See</u> <u>State v. Monroe</u>, 345 So.2d 1185, 1189 (La. 1977) (citing <u>State v. Hodgeson</u>, 305 So.2d 421 (La. 1974)).

Out-of-court statements by a witness that are testimonial are barred, under the Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statements might be deemed reliable. <u>See</u> <u>Davis v. Washington,</u> 547 U.S. 813 (2006).

However, when the coroner's report is admitted without the testimony of the maker as to the authenticity of the report and the report is cumulative evidence as to death and cause of death, there is no substantial violation of the defendant's statutory or constitutional rights. State v. Vincent, 338 So.2d 1376 (La. 1976).

The autopsy report written by Dr. Frank Peretti was introduced and admitted through the testimony of lay-witness James Dallas Parker III, a part-time investigator for the Natchitoches Parish Coroner, who is also an EMT and a paramedic (Doc. 1-3, pp. 29-33/89). Parker testified that he "examined the body" and read the first page of Dr. Peretti's pathology report, which showed James died from an overdose of cocaine, morphine, and Alprazolam (Doc. 1-3, pp. 34, 37/89). Parker testified that Dr. Peretti's findings were consistent with the results of the hospital's urine screen (Doc. 1-3, p. 38/89).

The State failed to lay a foundation for introduction of Dr. Peretti's report through a lay witness by showing that Dr. Peretti was unavailable to testify, but defense counsel did not object. Instead, defense counsel called Dr. Peretti as a defense witness, and he testified extensively to the findings in his report (Doc. 1-4, p. 42/137). See State v. Hayes, 585 So.2d 610, 622 (La. App. 2d Cir. 1991). Therefore, Shelton cannot show a violation of the Confrontation Clause or prejudice arising from admission of the Dr. Peretti's report by the State through a lay witness.

Shelton also complains his attorney should not have called Dr. Peretti and Dr. Kamm to testify, and instead should have objected to admission of the autopsy report.

8

However, as discussed below, Dr. Peretti's testimony and report were substantially favorable to Shelton, and he explained the scientific findings in his pathology report to the jury. Likewise, Dr. Kamm's testimony was very favorable to Shelton.[1] Therefore, Shelton did not carry his burden of proving prejudice because his attorney called Dr. Peretti and Dr. Kamm as defense witnesses.

### 2. Correct definition of "felony manslaughter" was given.

Next, Shelton contends his trial counsel was ineffective for failing to object to erroneous jury instructions on felony manslaughter, La. R.S. 14:31(A)(2)(a).[2] Shelton complains the trial judge failed to include an instruction on causation. The trial judge instructed the jury as to the statutory definitions of felony manslaughter and the relevant felonies of simple rape, attempted simple rape, sexual battery, attempted sexual battery, possession or distribution of a Schedule II controlled dangerous

---

[1] Dr. Richard Kamm, an expert in anatomic and clinical pathology and forensic medicine (Doc. 104, pp. 5 & 8/137), testified that he was contacted by the Natchitoches Parish District Attorney to analyze the hospital drug screen report, death certificate, ambulance report, toxicology report, and autopsy report, but not to do any independent testing (Doc. 1-4, pp. 12-14, 16/137). Dr. Kamm agreed with Dr. Peretti's findings (Doc. 1-4, pp. 19-28, 41/137). Dr. Kamm also testified that James may have ingested heroin rather than morphine and, if so, he inhaled it (Doc. 104, pp. 30-31/137). Dr. Kamm testified that James inhaled the cocaine, did so more than once, and did so while drinking (Doc. 104, p. 28, 37-38/137). Dr. Kamm testified that it is very difficult to force someone to involuntarily inhale something (Doc. 104, p. 28/137).

[2] Shelton's offense was committed in 2005, when a murder involving a controlled dangerous substance fell under the manslaughter statute. La. R.S. 14:31. The second degree murder statute, La. R.S. 14:30.1(A), was amended by 2009 La. Acts No. 155, § 1 to modify the definition of second degree felony murder to include the unlawful distribution of controlled dangerous substances. State v. Kirkland, 01–425 (La. App. 5 Cir. 9/25/01), 798 So.2d 263, 268, writ denied, 01–2967 (La. 10/14/02), 827 So.2d 415.

substance (cocaine and morphine), and possession or distribution of a Schedule IV controlled dangerous substance (alprazolam) (Doc. 1-4, pp. 105-/137).

The felony manslaughter rule embodied in La. R.S. 14:31(A)(2)(a) permits a defendant's conviction for the homicide, despite defendant's lack of intent to cause death or great bodily harm, but the prosecutor is also required to prove that defendant's conduct was a legal cause of the killing. State v. Kalathakis, 563 So.2d 228, 232 (La. 1990).[3] A causal relation between the defendant's conduct and the harm for which the prosecutor seeks to impose criminal sanctions is an essential element of every crime. Causation is a question of fact that has to be considered in light of the totality of circumstances surrounding the ultimate harm and its relation to the actor's conduct. See Kalathakis, 563 So.2d at 231.

The issue of a jury instruction on causation was raised in State v. Irving, 2013-0535 (La. App. 1st Cir. 11/1/13), 2013 WL 5915218, writ denied, 2013-2821 (La. 5/16/14), 139 So.3d 1024. The trial court provided the full definition of second-degree felony murder in its jury instructions. The court of appeal held the statutory definition adequately covered the applicable law, and that a separate instruction on causation was not required. State v. Irving, 2013-0535 (La. App. 1 Cir. 11/1/13), 2013

---

[3] In a related context, the Louisiana Supreme Court interpreted the felony murder rule (La. R.S. 14:30.1(A)(2), (3)) to require that a direct act of a defendant or his accomplice cause the death of the victim and has refused to hold persons criminally culpable for setting in motion chains of events that ultimately result in the deaths of others. State v. Small, 2011-2796 (La. 10/16/12), 100 So.3d 797, 806.

10

WL 5915218, writ denied, 2013-2821 (La. 5/16/14), 139 So.3d 1024. For the same reason, a jury instruction on causation in felony-manslaughter is also not required. The only difference between felony-murder and felony-manslaughter is the degree of the felony involved. Causation must be proven for both offenses.

Shelton has not cited any authority for the proposition that an instruction on causation must be given in a criminal jury trial for felony manslaughter. Since the correct statutory definitions of felony manslaughter and all relevant felonies were given, a separate instruction on causation was unnecessary. Shelton has not carried his burden of proving the trial judge gave erroneous jury instructions to which his attorney should have objected.

### 3. Evidence of James's drug abuse was introduced.

Shelton argues his attorney was ineffective for failing to investigate James' drug abuse and failing to interview James's ex-girlfriend and her family. Shelton contends James's ex-girlfriend would have testified that James had abused illegal drugs with her in the past. Shelton argues his attorney allowed the testimony of James's friends and family, who said that James had never used illegal drugs, to go uncontested.

Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. See Nelson v. Hargett, 989 F.2d 847, 850 (5th Cir. 1993) (citing Strickland v. Washington, 466 U.S. 668, 691 (1984)). However, bare allegations do not suffice. A defendant who alleges a failure

11

to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial. See Nelson, 989 F.2d at 850 (citing United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989)). Complaints of uncalled witnesses are not favored because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative. See Graves v. Cockrell, 351 F.3d 143, 155 (5th Cir. 2003), amended in other part, 351 F.3d 156 (5th Cir. 2003), cert. den., 541 U.S. 1057 (2004) (citing Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978)); see also Boyd v. Estelle, 662 F.2d 388, 390 (5th Cir. 1981).

Where the only evidence of a missing witness's testimony is from the defendant, the Court views claims of ineffective assistance with great caution. See Sayre v. Anderson, 238 F.3d 631, 636 (5th Cir. 2001) (citing Lockhart v. McCotter, 782 F.2d 1275, 1282 (5th Cir.1986), cert. den., 479 U.S. 1030 (1987)). Unless a petitioner provides the court with affidavits (or similar matter) from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice. Sayre, 238 F.3d at 636.

Contrary to Shelton's assertion, his trial attorney did not allow the testimony from James' friends and family to go uncontested. Dr. Peretti clearly and specifically testified that James had been using cocaine for at least 24 hours prior to his death, and that he had been drinking while using cocaine. Dr. Peretti testified that the lab

12

reports of James's blood showed the cocaine and alcohol had bonded to form cocetheline (Doc. 1-4, p. 59/137). Dr. Peretti testified that, although families tend to think one thing, science does not lie (Doc. 1-4, p. 60/137). Dr. Kamm's testimony substantially agreed with Dr. Peretti. Therefore, Shelton offered expert testimony and lab reports to contradict the testimony of James's family and friends. Dr. Peretti's and Dr. Kamm's neutral testimony should have carried more weight than the testimony of James's ex-girlfriend, who used illegal drugs. Shelton has not shown any prejudice arising from his attorney's failure to call James's former girlfriend to testify. Moreover, Shelton did not provide an affidavit or similar evidence to show what the ex-girlfriend would have said.

Therefore, Shelton has not carried his burden of proving his trial attorney erred by failing to investigate James's ex-girlfriend and call her as a trial witness.

4. **Expert witnesses testified as to how the drugs were introduced into James's system.**

Shelton's trial counsel was ineffective for failing to call an expert witness to testify about how the drugs were introduced into James's system.

Defense counsel called Dr. Frank Peretti to testify as an expert in forensic pathology (Doc. 1-4, p. 42-46/137). Dr. Peretti testified that he autopsied James; he believed James had ingested cocaine repetitively for at least 24 hours prior to his death; James was drinking when he was using cocaine because the cocaine and alcohol bonded on a molecular level to form cocetheline, which was present in James'

13

blood; he had ingested morphine and Alprazolam orally within 24 hours of his death (James did not have any injection sites); and he had ingested the cocaine either by inhaling it through his nose or by smoking it (because there were no injection sites) (Doc. 1-4, pp. 58-62, 67/137). Dr. Peretti's testimony was very favorable to Shelton, since it showed James had abused illegal drugs *at least* 24 hours before he died, instead of having never used illegal drugs before meeting Shelton, as the prosecution portrayed.

Defense counsel also called Dr. Kamm, an expert in forensic medicine and anatomic and clinical pathology, who essentially agreed with Dr. Peretti's findings and conclusions, and testified that James probably voluntarily inhaled the cocaine (Doc. 104, p. 28, 37-38/137).

Therefore, Shelton's contention that his attorney did not call an expert witness to testify about how the drugs were introduced in James's system is erroneous.

> 5. **Shelton did not prove the failure to investigate roommate Roy Harris was ineffective assistance of counsel.**

Shelton also contends his trial attorney erred in failing to investigate and interview James' roommate, Roy Harris. Shelton contends Harris initiated the 911 call and alleges Harris was an eyewitness to the incident because he was the sober driver that night. Shelton contends Harris returned to the apartment between 3:00 and 4:00 a.m., noticed Shelton's bedroom door was closed, the light was on, and heard

14

people talking softly to each other. Shelton argues that Harris's testimony would have shown there were no sounds of a struggle.

Shelton has not provided an affidavit or similar evidence from Roy Harris to show what he would have said during an interview and at trial. Moreover, it is noted that, while the absence of sounds of a struggle could mean that James was voluntarily with Shelton, it could also mean that James was too intoxicated to struggle. Therefore, Shelton has not carried his burden of proving he was prejudiced by his trial counsel's failure to call Harris as a witness. See Sayre, 238 F.3d at 636.

### B. Ineffective Assistance of Appellate Counsel Claims

Next, Shelton contends his appellate counsel was ineffective for failing to raise the following issues on appeal: (1) improper admission of other crimes evidence; and (2) the trial court erred in denying Shelton's motion to continue the sentencing hearing and by imposing an excessive sentence.

#### 1. Admission of other crimes evidence was not improper.

Defense counsel filed a motion to suppress evidence of the prior crimes for which Shelton had been convicted, including photographs from the crimes (Doc. 15-3, pp. 17, 19/81). The court admitted evidence of the Nevada sexual assault offense and evidence that Shelton had falsely identified himself as a police officer in Nevada and California, but excluded evidence of all other crimes (Doc. 15-3, p. 69-70/81). The court of appeals upheld that ruling (Doc. 15/3, p. 2/81).

15

Shelton complains that his trial attorney vigorously argued against admission of his prior convictions for sexual assault because, although Shelton was charged with manslaughter during the commission of simple rape or sexual battery (or the attempts), there was no physical evidence to show the victim had been raped or sexually assaulted. Shelton contends his appellate attorney should have made the same argument on appeal.

La. C.E. art. 412.2 provides that, "[w]hen an accused is charged with a crime involving sexually assaultive behavior…evidence of the accused's commission of another crime, wrong, or act involving sexually assaultive behavior may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403." The prosecutor provided Shelton with notice in advance of trial that it intended to introduce evidence that he had previously been convicted of another sexual assault.

Shelton's trial attorney argued there was no evidence to show James had been sexually assaulted or raped (Doc. 1-4, pp. 117/137). However, Shelton was also charged, in the alternative, with manslaughter while *attempting* to commit those offenses. The facts that James was found naked from the waist down and under the influence of controlled dangerous substances fit the method of Shelton's prior offense of sexual assault and tended to show an attempted offense with James. Moreover, Shelton was also charged with manslaughter while dispensing or distributing

controlled dangerous substances to James, which also fit the method of Shelton's prior offense.[4]

Finally, Shelton argues the admission of the photograph of his victim in Nevada, unconscious, bound at the wrists, and wearing only a T-shirt, was prejudicial. However, that photograph and the one of James were similar enough to indicate Shelton's system and methods.[5]

Therefore, the evidence of Shelton's prior sexual assault offense was admissible and his appellate attorney was not ineffective for failing to raise the issue on appeal.

## 2. Sentencing hearing and sentence imposed were appropriate.

Shelton also contends his appellate counsel was ineffective for failing to argue the trial court erred by denying his motion to continue the sentencing hearing, and in imposing an excessive sentence.

Shelton's trial attorney moved for a continuance in order to have time to receive the evidence introduced at Shelton's sentencing on his prior sexual battery offense in Nevada (Doc. 1-4, pp. 118-19/137). Shelton has not alleged specifically how

---

[4] Regardless of whether James ingested a large amount of cocaine prior to meeting with Shelton (as the scientific evidence showed), Shelton provided James with additional controlled dangerous substances (morphine and Alprazolam), which caused a fatal overdose.

[5] **Error! Main Document Only.**Louisiana law generally prohibits the admission of "other crimes evidence," that is, evidence of criminal conduct uncharged in the subject indictment, with exceptions for proving identity, system, or res gestae. See Robinson v. Whitley, 2 F.3d 562, 566 (5th Cir. 1993), cert. den, 510 U.S. 1167 (1994) (citing State v. Prieur, 277 So.2d 126, 128 (La. 1973)). In Louisiana, evidence of other crimes can be admitted to show intent, knowledge, or system, but not to show motive. See Webb v. Blackburn, 773 F.2d 646, 652 (5th Cir. 1985).

17

a delay in his sentencing would have assisted him. Shelton has not shown specifically what information his trial counsel would have received that would have mitigated his sentence (Doc. 1-4, p. 119/137). Therefore, Shelton has not shown specifically how he was prejudiced by the trial court's failure to continue his sentencing, or how he was prejudiced by his appellate attorney's failure to raise this issue on appeal.

Shelton also contends his sentence was excessive, and that his appellate counsel should have raised that issue on appeal. However, Shelton was sentenced to 30 imprisonment, which is within the statutory sentencing range of 10 to 40 years and less than the maximum sentence. See La.R.S. 14:31. Shelton was already serving a sentence of 35 years to life imprisonment in Nevada (Doc. 1-4, p. 121/147). Shelton has not shown specifically how his sentence was excessive, or how he was prejudiced by his appellate counsel's failure to raise this issue on appeal.

Therefore, Shelton has not carried his burden of proving he had ineffective assistance of appellate counsel.

## IV. Conclusion

Based on the foregoing, IT IS RECOMMENDED that Shelton's habeas petition be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 2(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being

18

served with a copy of any objections or response to the District Judge at the time of filing.  No other briefs (such as supplemental objections, reply briefs etc.) may be filed. Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged.  Timely objections will be considered by the district judge before he makes a final ruling.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.** See <u>Douglass v. United Services Automobile Association</u>, 79 F.3d 1415 (5th Cir. 1996).

Pursuant to Rule 11(a) of the Rules Governing Section 2254 cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.** See 28 U.S.C. § 2253(c)(2). **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

19

THUS DONE AND SIGNED in Alexandria, Louisiana on this 9th day of September 2016.

_____
HON. JOSEPH H. L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE